FILED by TB D.C.

Jul 19, 2016

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-20546-CR-SCOLA/OTAZO-REYES

18 U.S.C. § 371
18 U.S.C. § 981(a)(1)(C)

**UNITED STATES OF AMERICA**

**vs.**

**DANIEL MCKELVEY and**
**JEFFREY L. LAMSON,**

**Defendants.**
_________________________________/

# INFORMATION

The United States Attorney charges that:

## GENERAL ALLEGATIONS

At times material to this Information:

1. Defendant **DANIEL MCKELVEY** was a resident of Foster City, California, and acted as a promoter for companies that were registered to do business in the State of Florida.

2. Conspirator A was a resident of Lake Worth, Florida, and acted as a promoter for companies that were registered to do business in the State of Florida.

3. Conspirator B was a resident of Sarasota, Florida, and acted as a promoter and accountant for companies that were registered to do business in the State of Florida.

4. Conspirator C was a registered securities representative who conducted business in Boca Raton, Florida.

5. Defendant **JEFFREY L. LAMSON** was a resident of El Dorado Hills, California, and acted as an accountant and promoter for companies that were registered to do business in the State of Florida.

6. Premier Nursing Products Corp.; We Sell For U Corp.; Pashmina Depot.com Inc.; Liquid Financial Engines, Inc.; Mobieyes Software, Inc.; mBeach Software, Inc.; MIB Digital, Inc.; Intake Communications, Inc.; Teaching Time, Inc.; Hidden Ladder, Inc.; BCS Solutions, Inc.; Benefit Solutions Outsourcing, Corp.; Big Clix, Inc.; mLight Tech, Inc.; Blue Sun Media, Inc.; Blue Flash Communications, Inc.; FanSport, Inc.; ShopEye, Inc.; Mobile Vault, Inc.; Diamond Lane, Inc.; and, Sunchip Technology, Inc. (collectively, the "Shell Companies") were companies that had no actual business operations or activity.

7. The U.S. Securities and Exchange Commission ("SEC") was an agency of the United States responsible for enforcing the securities laws.

8. The Shell Companies each had a class of securities registered with the SEC pursuant to Section 12 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78l, and were required to file or filed reports with the SEC pursuant to Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), or filed reports under Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d). Annual or periodic reports for the Shell Companies were filed on Forms 10-K and 10-Q, respectively.

9. A "Straw CEO" was an individual who, in exchange for a fee, allowed his name to be listed as a chief executive officer on corporate paperwork.

10. Pursuant to 18 U.S.C. § 1350, each Form 10-K and Form 10-Q filed with the SEC was required to be accompanied by a written statement by the chief executive officer and chief

financial officer (or equivalent thereof) that the information contained in the report fairly presented, in all material respects, the financial condition and results of operations of the company.

11. A Form S-1 registration statement was required to be filed with the SEC in order for a company to issue stock to the public. The Form S-1 was required to disclose, among other things, the role of any promoter or officer, and the financial condition and results of operations of the company.

12. The Financial Industry Regulatory Authority ("FINRA") was a self-regulatory authority responsible for writing and enforcing securities rules for broker-dealers and registered securities representatives.

13. A Form 211 was required to be filed with FINRA in order for a company's shares to be traded via the OTC Bulletin Board or Pink Sheets. The Form 211 was required to be submitted to FINRA by a registered securities representative.

**CONSPIRACY TO COMMIT SECURITIES FRAUD**
**(18 U.S.C. § 371)**

Beginning in or around January, 2009, and continuing until at least in or around November, 2013, in Miami-Dade, Broward, and Palm Beach Counties, in the Southern District of Florida, and elsewhere, the defendants,

**DANIEL MCKELVEY and**
**JEFFREY L. LAMSON**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with each other and others known and unknown to the United States Attorney to commit certain offenses against the United States, that is:

(1) to knowingly and willfully execute a scheme and artifice to defraud any person in connection with any security registered under Section 12 of the Securities Exchange Act of

1934, or that is required to file reports under Section 15(d) of the Securities Exchange Act of 1934, and to obtain, by means of false or fraudulent pretenses, representations or promises, any money or property in connection with the purchase or sale of any such security, in violation of Title 18, United States Code, Section 1348; and

(2) to knowingly and willfully make and cause to be made certifications in reports filed with the SEC pursuant to Sections 13(a) and 15(d) of the Securities Exchange Act of 1934, that falsely certified that the form fairly presented, in all material respects, the financial condition and results of operations of the issuer, in violation of Title 18, United States Code, Section 1350(c)(2).

**PURPOSE OF THE CONSPIRACY**

14. It was a purpose of the conspiracy for the conspirators to unlawfully enrich themselves by creating shell companies and falsely and fraudulently registering them with the SEC, so that the companies could issue shares which could be traded in the penny stock markets. After obtaining approval for the shares to be publicly traded, the conspirators would secretly obtain control of all or nearly all of the shares, and would sell the companies and the secretly-controlled shares at a profit to buyers who would then utilize the companies to engage in stock swindles or other manipulation schemes.

**MANNER AND MEANS OF THE CONSPIRACY**

The manner and means by which the defendants and their conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

15. **DANIEL MCKELVEY,** Conspirator A, Conspirator B, and **JEFFREY L. LAMSON** would recruit individuals to serve as Straw CEOs for the Shell Companies. The conspirators would inform the Straw CEO that they would have no further role with the company and would be paid only when the company was later sold. **MCKELVEY**, Conspirator A, and

Conspirator B would thereafter file incorporation documents with the State of Florida and obtain employer identification documents from the IRS, reflecting the name of the Straw CEOs as the sole officer and/or director of the companies.

16. **DANIEL MCKELVEY,** Conspirator A, Conspirator B, and **JEFFREY L. LAMSON**, would open bank accounts in the name of the Shell Companies, using funds and documents provided by the conspirators but with the Straw CEO listed on the bank account. This bank account would be controlled by the conspirators and not typically accessed by the Straw CEO. **MCKELVEY**, **LAMSON**, Conspirator A, and others acting at their direction would, in some instances, obtain a handwritten signature of the Straw CEO on a blank piece of paper and scan that signature into a computer program for future use.

17. **DANIEL MCKELVEY**, Conspirator A, Conspirator B, and others, would prepare false and fraudulent corporate documents for the Shell Companies, such as board meeting minutes, stock certificates and shareholder lists. The conspirators would then submit these false and fraudulent documents and other false information to the SEC on Form S-1 in order to obtain effective registration of the Shell Companies. Once a company's registration was effective, **MCKELVEY**, Conspirator A, Conspirator B, and others would thereafter file periodic reports for the Shell Companies on Forms 10-K and 10-Q. These reports were required to be filed pursuant to 15 U.S.C. § 78m(a), or were filed pursuant to 15 U.S.C. § 78o(d). The reports did not disclose the role of the conspirators with the respect to the Shell Companies or the true purpose of the companies.

18. **DANIEL MCKELVEY**, Conspirator A, Conspirator B, and others, would fraudulently place the Straw CEOs' electronic signatures on the Forms S-1, 10-K and 10-Q, and would create false corporate documents using the names and signatures of the Straw CEOs. In

some instances, the conspirators would also place false notary seals and signatures on corporate documents.

19. The Forms S-1, 10-K and 10-Q submitted to the SEC would contain false and fraudulent representations and material omissions, including that (a) the Straw CEO was in fact involved in the company, and worked 10 to 30 hours per week at the company; (b) the company had a legitimate business purpose as described in the filing; (c) the company had financial results and operations related to its business purpose as reported in the filing; and, (d) the company was intended to be used to further the business plan as described in the filing.

20. The Forms S-1, 10-K and 10-Q would contain purported electronic signatures and certifications of the Straw CEOs, certifying that the information contained in the periodic report fairly presented, in all material respects, the financial results and operations of the company. In reality, the Straw CEOs did not authorize the use of their names or signatures for any securities filing, and did not review any of the Forms S-1, 10-K or 10-Q before they were filed. In most instances, the Straw CEOs did not know there were any securities filings referencing their name at all.

21. **DANIEL MCKELVEY**, Conspirator A, Conspirator B, and **JEFFREY L. LAMSON**, would recruit individuals to serve as nominee shareholders, to make it appear that there was a group of shareholders that were unaffiliated with the company. This was done in order to create a class of unrestricted shares that could later be publicly traded. In reality, these nominee shareholders were promised a fixed amount of money once the company was ready to be sold, in exchange for allowing their names to be used as shareholders on subscription agreements. These shares were actually controlled by **MCKELVEY**, Conspirator A, and Conspirator B, and were later transferred into accounts controlled by these conspirators without disclosure to the SEC and the public.

22. For many of the Shell Companies, Conspirator C, along with other conspirators, would submit a Form 211 to FINRA to obtain approval for the company's shares to be publicly traded over the counter. The Form 211 and follow-up communications provided by Conspirator C to FINRA, would include false and fraudulent information about the role of the Straw CEO at the company, the relationship between Conspirator C and the company, and the business operations of the company. In the Form 211 and in other forms, Conspirator C would conceal from FINRA, the SEC and others, the role of the conspirators with respect to control of the Shell Companies. Conspirator C would also falsely represent that **DANIEL MCKELVEY**, Conspirator A, and other conspirators had no affiliation with the Shell Companies to facilitate electronic trading of shares controlled by the conspirators.

23. **DANIEL MCKELVEY**, Conspirator A, Conspirator B, Conspirator C, and other conspirators, would seek buyers for the Shell Companies. Prior to such a sale, **MCKELVEY**, Conspirator A, and Conspirator B would obtain control of all or nearly all of the unrestricted shares of the company without disclosure of such control to the SEC or the public. These conspirators would negotiate a sale price that included control of the corporate shell as well as the secretly controlled and unrestricted shares, and then convey control of the company to a person or entity designated by the buyer. The sale of the company to the buyer was disclosed to the SEC and the public, and usually took the form of a "reverse merger."

24. After FINRA gave approval for the shares to be traded over the counter, and the sale with the buyer was negotiated, **DANIEL MCKELVEY**, Conspirator A, Conspirator B, and Conspirator C would facilitate transfer of the secretly controlled shares to the buyer. The transfer of the unrestricted shares to the buyer, typically to a separate person or entity designated by the buyer, would not be disclosed to the SEC and the public. During the scheme, shares of the Shell

Companies were purchased on the open market by investors, including investors located in Miami-Dade County.

25. After paying certain expenses, **DANIEL MCKELVEY**, Conspirator A, and Conspirator B, would divide the proceeds of the scheme among themselves.

**OVERT ACTS**

In furtherance of the conspiracy and to achieve the objects and purpose thereof, at least one conspirator committed and caused to be committed, in the Southern District of Florida and elsewhere, at least one of the following overt acts, among others:

1. On or about September 24, 2012, in Boca Raton, Florida, Conspirator C executed a Form 211 on behalf of FanSport, Inc., for the purpose of obtaining approval for shares of the company to be publicly traded, containing false representations as to the role of the Straw CEO and concealing the involvement in and control over the company by **DANIEL MCKELVEY** and Conspirator A.

2. On or about February 6, 2013, via a third-party vendor located in Broward County, Florida, **DANIEL MCKELVEY** and Conspirator A caused the filing of a Form 10-Q with the SEC on behalf of FanSport, Inc., containing a certification by the Straw CEO pursuant to 18 U.S.C. § 1350, that the information contained in the report "fairly presents, in all material respects, the financial condition and result of operations of the Company."

3. On or about July 23, 2013, Conspirator B transmitted an e-mail using account XXXXn@gmail.com, requesting payment for a portion of the proceeds for the sale of mLight Tech, Inc., to Conspirator A at XXXX42@gmail.com.

4. On or about September 12, 2013, **DANIEL MCKELVEY** and Conspirator A caused a wire transfer from Sabadell Bank account X-4471, in Boca Raton, Florida, to an account

controlled by **JEFFRELY L. LAMSON** at Bank of the West, in El Dorado Hills, California, account ending in X-2223, of $2,000, in relation to the sale of mLight Tech, Inc.

5. One or about October 4, 2013, **DANIEL MCKELVEY** caused a wire transfer of $69,976.84 from Charles Schwab account ending in X-9488 in San Francisco, California, to TD Bank account ending in X-4319 in Lake Worth, Florida in the name of MBN Consulting, Inc., that was controlled by Conspirator A, as a distribution of proceeds related to the sale of Big Clix, Inc.

All in violation of Title 18, United States Code, Section 371.

**FORFEITURE**
**(18 U.S.C. § 981(a)(1)(C))**

1. The allegations in the General Allegations section and the Manner and Means section of this Information are re-alleged and incorporated herein by reference for the purpose of alleging forfeiture to the United States of America, of property in which **DANIEL MCKELVEY** or **JEFFREY L. LAMSON** has an interest.

2. Upon conviction of the offense alleged in this Information, **DANIEL MCKELVEY** and **JEFFREY L. LAMSON** shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the offense of conviction.

3. With respect to defendant **DANIEL MCKELVEY**, the property subject to forfeiture includes, but is not limited to, $1,560,192.

4. Pursuant to Title 21, United States Code, Section 853(p), made applicable through Title 28, United States Code, Section 2461, if any property described above as being subject to forfeiture, as a result of any act or omission of the defendant: cannot be located upon due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States

to seek the forfeiture of other property of the defendant up to the value of the above-described forfeitable property, and it is intent of the United States to seek a forfeiture money judgment in that amount.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and the procedures set forth in Title 21, United States Code, Section 853, made applicable through Title 28, United States Code, Section 2461(c).

WIFREDO A. FERRER
UNITED STATES ATTORNEY

JERROB DUFFY
ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA** **CASE NO.** ____________________

**vs.**

**DANIEL MCKELVEY, et al.,**

**Defendants.**
______________________________/

## CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

**Court Division:** (Select One)

_X_ Miami ____ Key West ___ FTL _____ WPB ____ FTP

New Defendant(s) Yes _____ No ____
Number of New Defendants ___
Total number of counts ___

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter: (Yes or No) No___
List language and/or dialect ____________________

4. This case will take _0_ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

| (Check only one) | | | (Check only one) | |
|---|---|---|---|---|
| I | 0 to 5 days | X | Petty | |
| II | 6 to 10 days | | Minor | |
| II | 11 to 20 days | | Misdem. | |
| IV | 21 to 60 days | | Felony | X |
| V: | 61 days and over | | | |

6. Has this case been previously filed in this District Court? (Yes or No) No
If yes:
Judge: Case No.

Has a complaint been filed in this matter? (Yes or No) No
If yes:
Magistrate Case No. ____________________
Related Miscellaneous numbers: ____________________
Defendant(s) in federal custody as of ____________________
Defendant(s) in state custody as of ____________________
Rule 20 from the ____________________ District of ____________________

Is this a potential death penalty case? (Yes or No) No

7. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003? ______ Yes __X__ No

8. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007? ______ Yes __X__ No

JERROB DUFFY
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. A5501106

*Penalty Sheet(s) attached

REV 4/8/08

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name:** **DANIEL MCKELVEY**

**Case No**: ______

Count #: 1

Conspiracy

Title 18, United States Code, Section 371

* **Max. Penalty**: Five (5) year' imprisonment

Count #:

______

______

***Max. Penalty:**

Count #:

______

______

***Max. Penalty:**

Count #:

______

______

***Max. Penalty:**

***Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name:** **JEFFREY L. LAMSON**

**Case No:** ______

Count #: 1

Conspiracy

Title 18, United States Code, Section 371

* **Max. Penalty:** Five (5) year' imprisonment

Count #:

______

______

***Max. Penalty:**

Count #:

______

______

***Max. Penalty:**

Count #:

______

______

***Max. Penalty:**

***Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

United States of America
v.
Daniel McKelvey,
*Defendant*

Case No.

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: ____________________

*Defendant's signature*

*Signature of defendant's attorney*

*Printed name of defendant's attorney*

*Judge's signature*

*Judge's printed name and title*

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

United States of America )
v. ) Case No.
Jeffrey L. Lamson, )
)
*Defendant* )

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: ____________________

____________________
*Defendant's signature*

____________________
*Signature of defendant's attorney*

____________________
*Printed name of defendant's attorney*

____________________
*Judge's signature*

____________________
*Judge's printed name and title*